(15 Misc. Rep. 268.)

## DIFFIN v. REID.

(Superior Court of Buffalo, General Term. December 23, 1895.)

1. ACTION FOR SERVICES—EVIDENCE.

In an action on a contract for an alleged balance due plaintiff as salary for services rendered defendant, it appeared that plaintiff had been in defendant's employ several years; that he claimed that, at the beginning of the last year, defendant promised to pay him $2,500 for the year; that he had only received $2,100; and that, when he was first employed, defendant loaned him money with which to move from a foreign state to defendant's place of business, and took his notes therefor. Defendant claimed that he was to pay plaintiff $2,500 only if the business was prosperous and turned out well, and he set up such notes as a counterclaim. *Held,* that it was prejudicial error to permit plaintiff to testify to the agreement by which he left his former place of residence, and what it cost him to move.

2. SAME.

In such case evidence was admissible to show that defendant's business during such year resulted in loss, the amount of such loss, and whether it resulted from bad debts, or from the conduct of the business aside from such debts.

Appeal from trial term.

Action by Charles A. Diffin against William Reid to recover a balance alleged to be due for services rendered by plaintiff as a traveling salesman. From a judgment entered on a verdict in favor of plaintiff, and from an order denying his motion for a new trial, defendant appeals. Reversed.

Argued before HATCH and WHITE, JJ.

D. N. McNaughton, for appellant.
George Wing, for respondent.

HATCH, J. Upon the trial of this action, plaintiff gave evidence tending to establish that he was employed by defendant as a sales-

man, and had been for some years prior to January, 1893. The salary paid at the beginning of the service was $1,200 per year, and this sum had been increased from year to year until in 1892 he received $1,800. Defendant's principal place of business was at Detroit, Mich., and he had a branch store located at Buffalo. Plaintiff was employed as a traveling salesman, and was connected with the Buffalo branch. In February or March, 1893, he called upon defendant at Detroit, and applied for a raise in salary, stating that he wanted $2,500 per year. In reply to this, plaintiff testified that defendant "said he would give me twenty-one hundred dollars a year for the year, at the rate of $175 a month, and that he would give me a credit memorandum at the end of the year that would meet with my idea of price. I said that was satisfactory. I did not have any conversation with him after that in regard to salary, at all." Plaintiff continued in defendant's employ until February 10, 1894, when he was discharged. When plaintiff's employ began he was living at Meadville, Pa., and defendant loaned him sufficient money at that time to remove, with his family, to Buffalo. At the time when the salary was adjusted this loan was represented by notes of plaintiff, which defendant held, then amounting to $350, and it was then agreed that $25 per month should be retained from salary to apply on this debt. The debt was never paid, and in July, 1894, defendant recovered a judgment against plaintiff for $394.68, which judgment he pleaded as a counterclaim herein, and demanded judgment for the amount, with interest. It was upon this testimony that plaintiff sought to recover a balance of unpaid salary at the rate of $2,500 a year, he having only been paid at the rate of $2,100. No credit was ever made him of $400 at the expiration of the year, or at any other time, or of any other sum. Defendant testified, respecting the salary adjustment, that he told plaintiff "I will make the salary $175 per month, or $2,100 for the year, commencing January 1st, and that, if the business was prosperous and turned out well, I would give him a further credit at the end of the year." It appeared that no formal demand was ever made by plaintiff for payment of the claimed unpaid salary prior to the commencement of this action. Several letters were written by him prior and subsequent to the discharge. One under date of May 10, 1893, on account of increased living expenses, asks for the $25 per month which was to be retained, and says, "If you insist on it, I will allow $25 per month to apply on the notes from May 1st, and try to make ends meet until the end of the year, when you promised an increased amount." One under date of February 28, 1894, admits the indebtedness upon the notes, offers to give a new note, pay interest, and holds out an expectancy of being able to pay the whole, or at least half the principal, the coming year. This letter also contains a statement of salary account, showing a balance in his favor of $108. No mention or claim is made of the credit of $400 to which he was entitled, and, when questioned with respect to this matter, he said, as the only explanation, "I wanted the $108 right then, to use." Prior to this, and under date of January 7, 1894, he had written: "In our talk last March, $2,100 was the agreed price, with a cr.

mem. at the end of the year. Is there to be any cr., or is that off?" On March 6, 1894, defendant wrote, claiming balance due on notes of $306.62, asking for transfer of certain lots, and repudiating claim for salary. In answer to this letter, plaintiff replied, questioning amount due, but admitting an indebtedness of $175.69, and says: "When I speak of short turns, I refer to the cr. memo. which you promised at expiration of last year. * * * I will insist on cr. memo. $108.00 salary."

In view of this testimony and the letters, it is quite evident that plaintiff's case rests upon quite slender supports, and, while his present position is not so entirely inconsistent with his former attitude as to require us to say that the verdict does not find some support in the evidence, it does require that we should look with care to see that defendant's case was in no wise prejudiced by any ruling of the trial court. Such examination leads us to the conclusion that in two particulars there is sound basis for complaint in the reception of evidence in one case, and its rejection in another. Evidence was permitted to show the circumstances surrounding the removal of plaintiff from Meadville to Buffalo. This was not material to any right of plaintiff. Its only possible materiality was to show the basis of indebtedness represented by the notes. Yet, after plaintiff had been examined and cross-examined, his counsel asked:

"Did you have a conversation in Buffalo, with Mr. Reid, in regard to your moving to Buffalo? Something in regard to your house in Meadville? If so, state the conversation."

This was objected to as immaterial and incompetent, the objection was overruled, defendant excepted, and witness answered:

"I had a conversation with Mr. Reid one time, when he was here, in regard to my moving. I had a lease on my hands at Meadville from the 1st of April to the following April, and I said I would have to pay something to get released from that. He said I could probably do it for a reasonable amount. I went on and made an arrangement, and bought off the lease for $75."

The whole of this answer was properly characterized by the objection. It was entirely immaterial to the issue, as it did not have the remotest bearing upon whether the contract sought to be enforced was made, two or three years later, upon which fact alone the basis of liability is found. It was incompetent, as it was neither adequate nor sufficient, in any sense, to support plaintiff's cause of action, and was very likely distinctly prejudicial to defendant. The agreement by which plaintiff left Meadville, and what it cost him, were matters which existed long before the present arrangement was made; and the fact that plaintiff was required to pay a sum of money to another, in order to enter plaintiff's employ, ought not to be permitted to be used for the purpose of creating a right to now take money from the defendant, or to allow the jury to speculate upon or contemplate the hardships which plaintiff endured as a result of his engagement with defendant. Defendant was not required to move to strike out the testimony after it was given. His objection was to the question. That was immaterial and incompetent. The

answer was the same,—one part as much as another,—and may have tended to defendant's prejudice. Defendant testified:

"We had some very heavy losses in the Buffalo territory in 1893, and the net result was $10,000 loss. Mr. Wing: I object. It is not important what the amount of the loss was. By the Court: Strike that out,—the last part. I do not think the loss in the business resulting from poor debts, or anything of that kind, would have any influence upon the question at all. The question would be whether the business was profitable or not, not whether they lost debts or not. Q. What was the general result of the business in Buffalo for the year 1893? By the Court: That is admitted only relating to the business, not the loss by bad debts; not what the losses were. A. The result was bad. Q. I ask you further what was the amount of the loss of the Buffalo business for that year? Mr. Wing: I object. By the Court: You mean the general balance of accounts, after they got the bad debts and everything? Mr. McNaughton: Yes. (Ruled out and exception taken.)"

The court, by its first ruling, took the position that loss by bad debts could not be shown, and struck out the answer for this reason. By inference, it would seem that it held proper to show what the loss was in the conduct of the business in other respects. If this be the rule, it was not followed. The answer stated the net result was a loss of $10,000, in no wise limited to bad debts; nor, from anything that appeared in the answer, could it be said to include them. The objection was to showing any amount of loss from any source, and such was the final ruling of the court, as that embraced "bad debts and everything." We think this testimony was competent, whether it included or excluded losses by bad debts. Defendant's testimony was that he was to give no credit unless "the business was prosperous and turned out well." Whether it was prosperous and did turn out well became, therefore, a pertinent and material fact. If goods be sold on credit, and thereafter, when the day of payment arrives, the debtor is found insolvent and unable to pay, or if, from any cause, the seller loses the price of the goods, it cannot be said, in terms, as we understand it, to be a prosperous transaction, at least for the seller, nor can that transaction be said to have turned out well in a business sense. The evident construction to be placed upon the language used is that if in the course of the business of the year, from all sources, it had been found that the business made a profit, then it might be said to have been prosperous and turned out well, at least in a degree, and, dependent upon the profit side, would be the degree of prosperity. If this view of the contract was to be taken by the jury, then it became of importance for them to know what had been the amount of profit or loss, in order to find whether, within fair meaning, the business had been prosperous, or the reverse. To limit the statement that the result was bad did not give to the defendant all to which he was entitled. He had the right to lay before the jury how much he had lost, if any, the sources of his loss, and all facts properly connected therewith, in order that they might see that plaintiff had no right to require of defendant any further sum.

It follows from these views that the judgment and order should be reversed, and a new trial ordered, costs to abide event.